## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

MARY FRANKS,                               :        The Hon. Joseph H. Rodriguez

             Plaintiff,        :        Civil Action No. 07-6005

     v.                                :        **OPINION**

                              :

CAPE MAY COUNTY, CAPE MAY
COUNTY SHERIFF'S DEPARTMENT,        :
THOMAS HEGARTY, and
SCOTT KNOEDLER,                            :

            Defendants.        :

_____

**RODRIGUEZ, J.**

     Presently before the court is Defendants' motion for summary judgment [Dkt.

Entry No. 49], pursuant to Fed. R. Civ. P. 56, filed by Cape May County ("County") and

Cape May County Sheriff's Department ("Sheriff's Department").[1]  Plaintiff Mary Franks

("Plaintiff" or "Franks") filed this action alleging violations of her constitutional rights

arising out of her February 16, 2007 arrest in Villas, New Jersey.[2]  The Court has

reviewed the written submissions of the parties and heard oral argument on the motion

on July 21, 2010.  For the reasons stated on the record that day as well as those stated

below, Defendants' motion for summary judgment is granted in part and denied in part**.**

---

[1] Thomas Hegarty and Scott Knoedler are also defendants in this case, but did not join in the motion for summary judgment.

[2] This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) over Plaintiff's 42 U.S.C. § 1983 claim for violation of her federal constitutional rights. The court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      *Franks' Arrest and Detention*

On February 16, 2007 at approximately 8:30 a.m., Franks was in the kitchen of her home in Villas, New Jersey babysitting her granddaughter when Cape May County Sheriff's officers Thomas Hegarty ("Hegarty") and Scott Knoedler ("Knoedler") knocked on her door. (Am. Compl. at ¶ 12.)

What happened next is disputed.  For the purposes of the present motion, the Court must consider the facts in a light most favorable to the non-moving party.  Franks alleges that when Hegarty and Knoedler arrived at her home, Knoedler went to the front door, and Hegarty went to sliding glass door at the back of the house. (Compl.  at ¶ 14.) Franks claims Hegarty announced he was there with an arrest warrant for "Anthony," to which plaintiff replied, "There is no Anthony here." (Hegarty Dep. at 168:1-4; Franks Dep. at 84:4-10.)  In fact, the warrant was for Andrew Langford, the father of Franks' granddaughter, for unpaid child support. (Def. Statement of Material Facts at ¶ 2; Pl.'s Am. Compl. at ¶  12.)  The search warrant listed Franks's residence as Langford's last known address. (Am. Compl. at ¶ 13.)  Plaintiff asserts that Langford did not live there and that the defendants had no basis to believe that Langford was present at the home at they time they executed the warrant. (Am. Compl. at ¶ 13.)

Franks claims that Hegarty announced that he was coming into the house, at which point plaintiff asked him to show her a warrant to search the property. (Franks Dep. at 91:4-14.)  As a former nurse for the Cape May County Correctional Center, Franks testified that she was aware of the difference between a search warrant and arrest warrant from the knowledge she amassed in her previous job. (Franks Dep. at

2

93:10-94:3.)  Hegarty allegedly replied, "you don't need to see anything. I'm coming in there. You're going in and that kid's going to DYFS."[3] (Franks Dep. at 93:19-94:97.) Franks again asked to see the search warrant, and Hegarty motioned for her to open the door. (Pl.'s Response to Def.'s Statement of Material Facts at ¶ 6.)  Franks claims that when she unlocked the door to examine the warrant, Hegarty opened the door and entered her home without her consent. (Pl.'s Response to Def.'s Statement of Material Facts at ¶ 6; Franks Dep. at 100:20-102:25.)  When Franks demanded that Hegarty show her a search warrant or leave her house, he handed her a packet of papers. (Compl. at ¶ 17.)  Franks alleges that when she turned over the top page of the packet, Hegarty snatched the packet from her hands, causing the top of several pages to tear. (Compl. at ¶ 18.)  The packet then fell to the floor. (Compl. at ¶ 18.)  When Franks reached down to pick it up, Officer Hegarty handcuffed her. (Compl. at ¶ 19.)  Franks alleges Defendants manhandled her in such a manner that she was physically injured. (Compl. at ¶ 19.) Hegarty subsequently handcuffed Franks and took her to the Cape May County Correctional Center for processing. (Franks Dep. 100:17-102:13.)

Officers Hegarty and Knoedler offer a vastly different version of the arrest. According to the investigation report Officer Hegarty filed with Lieutenant Scott Mason, his immediate supervisor, as Knoedler and Hegarty pulled up to the residence they noticed a silver vehicle out front of the house that had not been there in a previous attempt to execute the warrant. (Def.'s Ex. B, Investigation Report at 2.)  Once he reached the back door, Hegarty avers that there were no lights on inside the home and

---

[3]Hegarty was referring to the New Jersey Division of Youth and Family Services.

he could not get a clear view of Franks. (Def.'s Ex. B, Investigation Report at 2.)  Hegarty asked Franks to open the door, to which she replied, "Go ahead talk," without opening the door. (Def.'s Ex. B, Investigation Report at 2.)  Hegarty testified that while he mistook the name of the suspect at first, he corrected himself once Knoedler came around to the back door and handed him the warrant. (Hegarty Dep. at 168:12-14.) Hegarty claims even after he informed Franks that they were conducting an investigation and needed information about the wanted suspect, she was hostile and uncooperative. (Def.'s Ex. B, Investigation Report at 3.)  Hegarty claims Franks eventually opened the sliding door and allowed him into the home, but she refused to give either Hegarty or Knoedler her last name. (Def.'s Ex. B, Investigation Report at 3.) Hegarty informed Franks that she could be arrested for obstruction of justice as she was interfering with an official investigation. (Def.'s Ex. B, Investigation Report at 3.) Franks told Hegarty that she would tell him her name if he showed her the warrant. (Def.'s Ex. B, Investigation Report at 3.)  Hegarty was at first reluctant to hand over the warrant, but eventually handed it to Franks in an effort to calm her down. (Def.'s Ex. B, Investigation Report at 3.)  Hegarty claims that he told Franks she could only read the first page, as the rest of the warrant contained privileged information. (Def.'s Ex. B, Investigation Report at 3.)  Franks, however, disregarded Hegarty's instruction and turned her body away from the officer in an attempt to read the remainder of the warrant. (Def.'s Ex. B, Investigation Report at 3.)  Hegarty then tried to grab the warrant but claims Franks used her left arm and body to violently push him away. (Def.'s Ex. B, Investigation Report at 3.)  Hegarty claims he wrestled with Franks briefly, but, concerned for the well-being of Franks granddaughter, he radioed Knoedler for help.

4

(Def.'s Ex. B, Investigation Report at 3.)  Franks resisted Hegarty's efforts to handcuff her but he was able to subdue her after about three minutes. (Def.'s Ex. B, Investigation Report at 3.)

Franks was charged with obstruction of justice under N.J.S.A. § 2C: 29-1, and resisting arrest under N.J.S.A. § 2C:29-2. (Def.'s Statement of Material Facts at ¶ 3; Compl. at ¶ 19.)  She was taken to the Cape May County Correctional Center for processing and detention. (Def.'s Statement of Material Facts at ¶ 4; Compl. at ¶ 21.)  As a part of her intake processing, she was subjected to a strip and visual body cavity search.  Two female corrections officers conducted the strip search[4] (Def.'s Ex. D, Hilton Report at 15) in a room with a curtain covering its entrance. (Def.'s Ex. C, King Report at 15.)  A review of the audiotape documenting Franks strip search reveals that she was asked to "bend over" and "spread her cheeks" repeatedly. (Def.'s Ex. C, King Report at 15.)  Sheriff John Callinan ("Callinan") testified that Hegarty remained outside the door leading to the room the entire time the search was conducted, which Callinan felt was "unprofessional." (Callinan Dep. at 62:7-63:10.)  Plaintiff Franks was detained for several hours before she was released later that evening after posting $15,000 bail. (Def.'s Statement of Material Facts at ¶ 4; Compl. at ¶ 6.)

## B.   *Internal Affairs Investigation*

Plaintiff lodged a complaint against Officers Hegarty and Knoedler with the Cape May County Sheriff's Office Internal Affairs ("IA") Division on February 16, 2007. (Pl.'s

---

[4]Although it is not binding on this Court for the purpose of determining the constitutionality of an alleged strip search, it is instructive to note that New Jersey law defines a strip search as "the removal or rearrangement of clothing for the purpose of visual inspection of the person's undergarments, buttocks, anus, genitals or breasts."  N.J. STAT. ANN. § 2A:161A-3.

Ex. D, IA Report Form.)  Franks charged that Hegarty and Knoedler entered her home without lawful authority and used excessive force when they arrested her. (Pl.'s Ex. D, IA Report Form at 1.) While the IA complaint was made in person, the portions of the form asking for the name of the individual who received the complaint and the officer to whom the report was forwarded were left blank. (Pl.'s Ex. D, IA Report Form at 1.)

There is a dispute as to which IA investigator was assigned to investigate Franks' claim. Undersheriff John W. Reemer ("Reemer") sent plaintiff a letter on February 21, 2007 informing her that Investigator James Abbott ("Abbott") was assigned to investigate her claim. (Pl.'s Ex. E, letter to Franks dated Feb. 21, 2007) However, Abbott testified at his deposition that he was not assigned to handle Franks's complaint because he was going away on vacation. (Abbott Dep. at 38:25-39:14.)  Abbott testified that he called plaintiff before he left on vacation, and she told him she was represented by counsel and had nothing to say to him. (Abbott Dep. at 40:12-42:1.)  Abbott testified that he did not ask Franks the name of the attorney representing her, nor did she volunteer that information. (Abbott Dep. at 42:2-25.)

At his deposition, IA investigator James Peterson ("Peterson") testified that he had a conversation with Franks's counsel regarding his client's IA complaint. (Pl.'s Ex. F, Peterson Dep. at 11:6-25.)  Peterson testified that during that conversation, Franks's counsel indicated to him that his client was willing to be interviewed about the complaint. (Pl.'s Responsive Statement of Material Facts at ¶ 11.)  Peterson testified that he told Reemer that Franks was willing to be interviewed. (Pl.'s Responsive Statement of Material Facts at ¶ 11.)  Peterson testified that his role in the investigation was limited to interviewing Knoedler and Hegarty together in the parking lot of a Wawa convenience

6

store and generating a report from that interview.  (Peterson Dep. at 12:5-9.)  Peterson admitted that he did not follow protocol when interviewing the officers together in the parking lot. (Peterson Dep. at 36:10-15.)  Typically, both officers should be interviewed separately to check for inconsistencies in their stories. (Peterson Dep. at 36:16-18.) Peterson testified that he extricated himself from any involvement in the investigation because he had previously been the subject of Franks's romantic advances when she worked at the correctional facility. (Peterson Dep. at 22:17-23:23.)  Peterson testified that he told Reemer the reason he had a conflict of interest. (Peterson Dep. at 22:17-23:23.)  Neither Abbott nor Peterson interviewed Franks regarding her complaint. (Abbott Dep. at 13:25-14:4; Peterson Dep. at 21:8-10.)  Both deny that they were assigned to investigate Franks's IA complaint. (Abbott Dep. at 39:2-12; Peterson Dep. at 21:8-12.) Reemer sent Plaintiff a letter dated April 2, 2007, closing the investigation for insufficient evidence. (Pl.'s Ex. I, letter to Franks, dated April 2, 2007.)

### C.    Dismissal of Franks's Indictment

The matter was the subject of a suppression hearing on September 6 and 10, 2007. (Compl. at ¶ 24.) New Jersey Superior Court Judge Raymond A. Batten ruled that Hegarty and Knoedler violated Franks' Fourth Amendment rights by illegally entering and searching her property without her consent and without a warrant. (Pl.'s Ex. L, Transcript of Judge Batten's Decision in the matter of State v. Franks at 44.) On October 25, 2007, Batten signed an order mandating suppression of all evidence directly and proximately flowing from the warrantless search of Franks' home, including the arrest. (Compl. at ¶ 25.)  On November 16, 2007, Judge Batten signed an order prepared by the

Cape May County Prosecutor's Office dismissing the indictment without prejudice against Mary Franks. (Pl.'s Ex. R, Order dated Nov. 16, 2007.) Lieutenant Scott Mason testified at his deposition that he asked the Cape May County Prosecutor's Office to appeal Judge Batten's decision to dismiss the resisting arrest charge because he believed Franks was going to sue the Sheriff's Department. (Mason Dep. at 93:8-25.) The prosecutor assigned to the case declined to appeal the decision. (Mason Dep. at 95:7-12.)

**D.    *Franks's Claims***

Franks initiated an action pursuant to 42 U.S.C. Section 1983 and N.J.S.A. §10:6-2(c) against Defendants seeking damages, civil penalties, reasonable attorney's fees, and costs of court. In Count I, Franks alleges that the Defendants' acts constitute a violation of her Fourth and Fourteenth amendment rights, as she claims she was subjected to an unlawful search, false arrest, and malicious prosecution and was deprived of her right to due process. Count II further alleges that the County failed to adequately train, supervise and discipline officers and employees of the Sheriff's Department. This failure to train, the plaintiff alleges, reflects a deliberate choice by the municipality to have such policies become custom, practice or policy.  Plaintiff further alleges that the county's failure to train was the proximate cause of her constitutional injury.

The remainder of the Complaint asserts pendent state common law and statutory claims.  Count III alleges that those claims averred in Counts I and II constitute a violation of the Plaintiff's rights under the New Jersey State Constitution Article I, Paragraph 7 and the New Jersey Civil Rights Act § 10:6-2 (c). In Counts IV through IX, Franks asserts claims for false arrest, malicious prosecution, intentional infliction of

emotional distress, battery, false imprisonment and invasion of privacy against Hegarty and Knoedler. Plaintiff also alleges that since Hegarty and Knoedler were acting within the scope of their employment, the county is liable for the claims averred in Counts IV-VII under the doctrine of *respondeat superior*.

Cape May County and the Cape May County Sheriff's Department filed this instant motion seeking summary judgment as to all counts. Defendants contend the County and its subdivisions are absolved from liability under § 1983 because there is no evidence that the Defendant officers conducted the allegedly unconstitutional arrest, search and detention of Franks pursuant to a municipal policy or custom.

## II.   STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable

inferences drawn from those facts in the light most favorable to the nonmoving party.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a
genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once
the moving party has met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine issue for trial. Id.;
Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to
withstand a properly supported motion for summary judgment, the nonmoving party
must identify specific facts and affirmative evidence that contradict those offered by the
moving party. Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon
mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v.
Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting
Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed, the plain language of
Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery
and upon motion, against a party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on which that party will bear
the burden of proof at trial. Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role
is not to evaluate the evidence and decide the truth of the matter, but to determine
whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
249 (1986).  Credibility determinations are the province of the factfinder. Big Apple
BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   DISCUSSION

Plaintiff's Complaint alleges both common law and constitutional claims against Cape May County and the Cape May County's Sheriff's Department. Plaintiff's constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, acting under the color of state law, deprives another of rights protected by the United States Constitution. See Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120 (1992). A plaintiff must demonstrate two essential elements to maintain a claim under Section 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that the plaintiff was deprived of his rights by a person acting under the color of state law. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989). Here, it is undisputed that Officers Hegarty and Knoedler were acting under color of state law because they were police officers acting in the line of duty. Thus, the only question before the Court is whether there was a constitutional deprivation.

Plaintiff asserts that Defendants are liable for her alleged constitutional injury because it 1) failed to properly train and supervise its sheriff's officers on arrest and strip search procedures that led to Franks's injury and 2) failed to adequately investigate citizen complaints against police officers and, as a result, tacitly authorized the misconduct of Hegarty and Knoedler. Defendants argue that Plaintiff's allegations are wholly conclusory and devoid of factual support.

A municipality is not liable for the misconduct of its employees under Section 1983 on a theory of *respondeat superior*. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 663-64 n. 7 (1978). Under Monell, a municipality may only be held

liable for a violation of a citizen's constitutional rights under § 1983 when, and only when, the "alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Monell, 436 U.S. at 690-91).  In Andrews v. City of Philadelphia, the Third Circuit articulated the distinction between these two sources of liability:

> A government policy or custom can be established in two ways. Policy is made when a "decision maker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy or edict. A course of conduct is considered to be a "custom," when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

895 F.2d 1469, 1480 (3d Cir. 1990) (internal citations omitted); see also, Bielevicz v. Dubinon, 915 F.2d 845 , 850 (3d Cir. 1990) (internal citations omitted). Custom may be established by proof of "knowledge or acquiescence in" the continuing conduct, see Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 482 n.10 (1986)), or "may be inferred from omissions or informal acts." Freedman v. City of Allentown, 853 F.2d 1111, 1116 (3d Cir. 1988) (citations omitted).

However, proof of an unlawful policy or custom is not enough to maintain a Section 1983 action. A plaintiff seeking to establish municipal liability under § 1983 must show that the policy or custom was the "moving force" behind the constitutional injury. Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006) (citing Bd. of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 400 (1997)). That is, she must show "a causal link between execution of the policy and the injury suffered." Gaines v. Gloucester

City Police Dep't, No. 08-3879, 2010 WL 760511, at *6 (D.N.J. Mar. 3, 2010) (citing

Losch v. Borough of Parkersburg, Pa., 736 F.2d 903, 910 (3d Cir. 1984)).  If the policy or

procedure is facially lawful, causation can only be established by showing the "municipal

action was taken with 'deliberate indifference' as to its known or obvious consequences.

A showing of simple, or even heightened, negligence will not meet this standard."

Brown, 520 U.S. at 407 (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89

(1989)).

       **A.**    **Cape May County Sheriff's Department**

     Here, as an initial matter, summary judgment is granted in favor of the Sheriff's

Department.  In New Jersey, a municipal police department is not an entity distinct

from the municipality.  See N.J. STAT. ANN. § 40A:14-118 (proclaiming that police

departments are "an executive and enforcement function of municipal government");

Adams v. City of Camden, 461 F. Supp.2d 263, 266 (D.N.J. 2006) (citing McGovern v.

City of Jersey City, No. 98-5186, 2006 WL 42236, at *7 n.4 (D.N.J. Jan. 6, 2006))

(police departments cannot be sued in conjunction with municipalities because police

departments are administrative arms of local municipalities, not separate entities),

Padilla v. Twp. of Cherry Hill, 110 F.App'x 272, 278 (3d. Cir. 2004) (same), DeBellis v.

Kulp, 166 F. Supp.2d 255, 264 (E.D. Pa. 2001) (same)).   This logic has been extended

to sheriff's departments.  See Open Inns, Ltd. v. Chester County Sheriff's Dep't, 24 F.

Supp. 2d 410, 417 n.13 (E.D.Pa. 1998). Accordingly, the Cape May County's Sheriff's

Department is not a legal entity possessing the legal capacity to be sued, and its motion

for summary judgment is granted.  The remainder of the claims and arguments

addressed pertain only to Defendant, Cape May County.

**B.     Failure to train**

Defendants argue that Plaintiff's claim that Cape May County failed to train and/or supervise its sheriff's officers in arrest and search procedures cannot go forward because Plaintiff has failed to proffer evidence that the on-the-job training Hegarty and Knoedler received was so deficient as to amount to a constitutional infirmity. Municipal liability may be predicated on a municipality's failure to train its employees. Canton, 489 U.S. at 388. However, not all failures or lapses in training will support municipal liability under § 1983. Woloszyn v. County of Lawrence, 396 F.3d 314, 325 (3d Cir. 2005). "City of Canton teaches us that municipal liability for failure to train cannot be predicated solely on a showing that the County's employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1029-30 (3d Cir. 1991). To succeed on a failure to train claim, a plaintiff must establish that the failure amounts to deliberate indifference to the constitutional rights of the person with whom the municipal agents come in contact. See id. at 1028. In other words, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality . . . can a city be liable for such a failure under section 1983." Canton, 489 U.S. at 388. The plaintiff must also prove that the identified training deficiency was closely related to his or her ultimate constitutional injury. Id. at 391; Colburn, 946 F.2d at 1030.

Consequently, to survive summary judgment on a failure to train claim, the plaintiff must present evidence that the need for more or different training was so obvious that the policymaker's failure to respond amounts to deliberate indifference. Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001) (citing Canton, 489 U.S.

14

at 390).

Franks argues that the sheriff's officers' training in arrest and search procedures was so deficient as to amount to a policy that was deliberately indifferent to her rights. Specifically, Franks contends that Officers Hegarty and Knoedler should have received more formal training for their duties as warrant officers, and that the officers' understanding was at odds with the official policies promulgated by both the Cape May County Sheriff's Department and New Jersey Attorney General. Plaintiff submitted an expert report prepared by Raymond F. King ("King"), a retired New York City police chief, in support of these allegations. (Def. Ex. C).

However, Franks has not identified specific deficiencies in the County's arrest and search training that, if cured, would have prevented her constitutional injury. There is evidence in the record that the County provides training, albeit minimal, to its officers on arrest and search procedures. It is undisputed that Officers Hegarty and Knoedler, as junior officers, both received on-the-job training from more senior officers. (Hegarty Dep. 49:9-66:15; Knoedler Dep. 25: 3-14.)  Officer Hegarty also testified that he received training on arrest, search and seizure procedures as a cadet at the Cape May County Police Academy. (Hegarty Dep., 49:9-66:15.) In his report, King opined that Hegarty and Knoedler should have received more formal training in executing arrest warrants. (See Def.'s Ex. C, King Report at 14.)  King further alleges that the two officers violated numerous orders set forth in the Cape May County Chief of Police Standard Operating Procedure No. 55 when searching Franks' residence. (See

King Report at 14.)[5]   However,  Plaintiff has not shown that the on-the-job training Hegarty and Knoedler received was constitutionally inadequate nor that it was inconsistent with the training other officers in the County's warrants unit received. See Mattei v. Plumsted Twp., No. 08-1840, 2009 WL 2413683, at *4 (D.N.J. Aug. 5, 2009) (granting summary judgment in favor of the township when plaintiff produced no evidence concerning the nature and quality of township's police training program). Even if the training Knoedler and Hegarty received was deficient, that alone is insufficient to hold Cape May County liable for a failure to train. See Canton, 489 U.S. at 390 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [county], for the officer's shortcomings may have resulted from factors other than a faulty training program.").  Although King's report testimony casts considerable doubt as to whether Hegarty and Knoedler implemented improper procedures during the search of Franks' home and her subsequent arrest, Monell makes it clear that a "municipality cannot be held liable solely because it employs a tortfeasor." 436 U.S. at 691.

Plaintiff attempts to distinguish the present case from Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005), in which the administratrix of a pretrial detainee who committed suicide in jail brought a § 1983 and wrongful death action against the county, its warden, and two corrections officers.  There, the Third Circuit

---

[5] King asserts that the search of Franks' residence violated numerous stipulations set forth in the Standard Operating Procedure. Neither Hegarty nor Knoedler ever attempted to get consent to search the residence in writing, in violation of No. 55, pages 6, paragraph 6-B ("A better practice is to obtain the consent in writing . . . .") Nor was Franks ever advised that she could refuse consent or revoke consent at any time, in violation of No. 55, pages 6-7, paragraphs 6-F and 6-H. Finally, neither Hegarty nor Knoedler ever sought approval from the shift commander prior to conducting the search, in violation of No. 55, page 7, paragraph 6-L.

held that the district court properly granted summary judgment in favor of the defendants on the grounds that the plaintiff failed to identify specific training measures that could have reasonably identified pre-trial detainees as suicidal. 396 F.3d at 319. Plaintiff here argues that unlike the expert report in that case, King's report identifies the type of training that should have been provided to Hegarty and Knoedler to prevent incidents such as the one at issue in this case.  However, the distinction Franks attempts to draw between her case and Woloszyn is ultimately unpersuasive. While King details at length how the procedures Hegarty and Knoedler employed when arresting Franks were incommensurate with the best practices employed by other police departments, he never identifies "specific training not provided that could reasonably be expected to prevent the [injury] that occurred" nor does he "demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can be attributed to a deliberate indifference to whether" constitutional injuries would occur. Woloszyn, 396 F.3d at 325 (citing Colburn v. Upper Darby Township, 946 F.2d 1017, 1029-30 (3d Cir. 1991) ("Colburn II") (emphasis added)).

The only evidence Franks proffers to meet the Colburn II requirement is that Hegarty and Knoedler attended a three-day training course titled "The Practical Approach to Understanding New Jersey Arrest" shortly after Judge Batten dismissed the criminal charges against Franks. (King Report at 15.)  King opined that this is the type of training Hegarty and Knoedler should have received when they were assigned to the warrants unit or shortly thereafter, and notes that Knoedler himself told a superior that he found it "helpful." (King Report at 15.) Franks relies heavily on this evidence in

17

an attempt to prove that if the County had required that its warrants officers attend this training course or comparable training at the onset of their hire, her injury would not have occurred. This testimony, however, is broad and conclusory. Evidence of this nature does not satisfy the first element of the <u>Colburn II</u> test. <u>See</u> <u>Woloszyn</u>, 396 F.3d at 325. Indeed, in <u>Wolosyzn</u>, even more evidence was presented on the plaintiff's failure to train claim than that which Franks presents here, and that court held such to be insufficient to survive summary judgment. In <u>Wolosyzn</u> the plaintiff's expert identified specific deficiencies in the defendant-county's training, such as that the correctional facility personnel were not properly trained in the use of emergency medical equipment and suicide prevention, but the Third Circuit found such evidence was conclusory. <u>Id.</u> As in <u>Wolosyzn,</u> the testimony Franks relies on suggests that her injury could have been prevented by better training, but the evidence does not specifically identify how that training would have prevented Franks's injury.

Furthermore, Plaintiff identified a single incident in which Cape May County sheriff's officers illegally entered and searched a private residence. A showing of deliberate indifference ordinarily requires proof of a pattern of underlying constitutional violations. <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 244 (3d Cir. 2004); <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000) (citing <u>Bryan County</u>, 520 U.S. at 408-09). Plaintiff has not produced evidence of a pattern of violations by the Cape May County Sheriff's Department that would have put the County decision-makers on notice that the existing training program in arrest and search procedures was inadequate.

However, the court in <u>Bryan County</u> noted that while it was possible to prove an

18

allegation of failure to train without evidence of a pattern, "the burden on the plaintiff in such a case is high." <u>Berg</u>, 219 F.3d at 276-77 (citing <u>Bryan County</u>, 520 U.S. at 409) (noting that no pattern of violations would be necessary to show deliberate indifference where it would be "obvious that a policy or custom would lead to constitutional violations."). A failure to train may be proven in the absence of a pattern of constitutional violations only in a "narrow range of circumstances" where a "violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." <u>Bryan County</u>, 520 U.S. at 409. To date, the only example the Supreme Court has provided of when the need for more or better training is so obvious as to constitute deliberate indifference is when a municipality issues handguns to officers without providing training on the use of deadly force. <u>See</u> <u>Canton</u>, 489 U.S. at 390 n. 10.

While the fact that Franks did not establish a pattern of Fourth Amendment violations by the Sheriff's Department is not dispositive of her claims, this case does not fit into the exception contemplated by the Supreme Court in <u>Canton</u> and <u>Bryan County</u>. Assuming that defendant officers' jobs as warrant officers would require them to handle recurring situations such as the one involved in this case, this is not a case where the County failed to equip them with "specific tools to handle" the situation. <u>Bryan County</u>, 520 U.S. at 410. The County provided at, a minimum, on-the-job training to Hegarty and Knoedler to prepare them for their duties as warrants officers. The Plaintiff has not identified any "glaring omission" in the County's training program from which one could reasonably say that the unlawful search of Plaintiff's home, or Plaintiff's arrest without probable cause, was a highly predictable consequence of the omission. Without

some evidence that Cape May County was aware that the training it offered was deficient, the Court cannot conclude that the evidence of a single alleged violation of Franks's constitutional rights is sufficient to demonstrate that the County failed to provide new or different training in the face of an obvious need.

Officers Knoedler and Hegarty went to Plaintiff's residence in an attempt to serve a warrant on Andrew Langford. There is no evidence in the record that prior to the incident the County or Sheriff Callinan knew of the risk that Franks' home may be illegally searched. Thus, the Plaintiff has not demonstrated prior knowledge and deliberate indifference by the County. See Beers-Capitol v. Whetzel, 256 F.3d 120, 137 (3d. Cir. 2001) (A successful deliberate indifference claim requires a showing that "the defendant knew of the risk to the plaintiff *before* the plaintiff's injury occurred."). Finally, even assuming, arguendo, that a deficiency or lack of training existed, Plaintiff has not shown that any deficiency caused her constitutional injury. Accordingly, summary judgment is granted as to Plaintiff's claim that Cape May County failed to train and/or supervise its sheriff's officers in arrest and search procedures.

### C.    Failure to investigate

Plaintiff also contends that there is genuine issue of material fact as to whether the County failed to adequately investigate and respond to the Internal Affairs ("IA") complaints against Officer Hegarty. A custom of failing to investigate citizen complaints may provide a basis for municipal liability if the "policy-maker 1) had notice that a constitutional violation was likely to occur, and 2) acted with deliberate indifference to the risk." Hernandez v. Borough of Palisades Park Police Dep't, 58 Fed.Appx. 909, 912 (3d Cir. 2003); Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d Cir. 1996), cert. denied,

20

519 U.S. 1151, 137 L.Ed.2d 219 (1997). The plaintiff must also prove that the failure to investigate proximately caused the plaintiff's injuries. See Watson v. Abington Twp., 478 F.3d 144, 156 (3d Cir. 2007); Beck, 89 F.3d at 972 n.6.  Franks has argued that there was a policy of "systematic and pervasive" failure to investigate IA complaints brought by citizens. In the present case, Franks complains that there was an inadequate investigation into her arrest, and that the IA division closed the investigation without properly interviewing her or the two officers involved. However, the question is not whether the investigation in this case was conducted in good faith, but whether the County's investigatory and disciplinary procedures constituted a "municipal policy" of deliberate indifference toward the risks of police misconduct, and adherence to that policy proximately caused Franks's constitutional injuries. Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995).

Franks presents no evidence that her arrest was caused by a county custom or policy of negligently investigating civilian complaints lodged against police officers.  To the extent that Plaintiff relies on Beck  in support of their argument that a triable issue of material fact exists regarding municipal liability, such reliance is misplaced. In Beck, the plaintiff produced evidence that the individual officer who had allegedly used excessive force against him had five prior complaints filed against him within a period of five years for similar conduct. 89 F.3d at 973. The Third Circuit held that the chief of police there had knowledge of the complaints by virtue of the chain of command. Id. The plaintiff in Beck also presented annual departmental reports detailing the high rate of excessive force incidents. Id.  In addition, that plaintiff produced evidence that the internal investigation process itself was flawed, and "structured to curtail disciplinary

21

action." Id. at 974. Investigators testified at trial that each complaint was treated in isolation and that the complainant's version of events were given less weight than the officer's. Id. at 968-69. In light of the wealth of evidence presented, the court held that a reasonable jury could conclude that the chief of police knew of, or acquiesced to, the use of excessive force by his officers. Id. at 976.

Here on the other hand, Plaintiff points to a single prior complaint lodged against Officer Hegarty for excessive force as evidence that there was a city practice or policy not to follow up properly on such claims and to tolerate an atmosphere of police misconduct. In February 2006, Barbara Fulford ("Fulford"), the mother of a man named Jeffrey Dahlen ("Dahlen"), made a complaint against both officers Hegarty and Knoedler. (Callinan Dep. at 57:15-58:5.) Fulford alleged that the officers used excessive force while arresting Dahlen at home. (Callinan Dep. at 58:11-16.) Both Hegarty and Callinan testified that the incident was not investigated beyond the initial processing. (Hegarty Dep. at 36:8-45:12; Callinan Dep. at 57:15-61:24.)  However, Fulford abandoned her claim before filing a written complaint. Even considered in the light most favorable to plaintiff, this evidence cannot sustain a finding that the County's allegedly inadequate investigation procedures caused the violation of the plaintiff's rights.

Nor does Franks's citation to statistics showing the number of unsubstantiated complaints support her allegations.[6]  Plaintiff provides no evidence that those

---

[6]Plaintiff offers evidence that of the twenty-nine civilian complaints the Cape May County Sheriff's Department received in 2007, the year of her arrest, only twelve resulted in disciplinary action. (Pl.'s Ex. J., Internal Affairs Summary Report Form.) Of the total twenty-nine cases that the Internal Affairs Division investigated, ten resulted in a disposition of "not sustained" and six were found to be unfounded. (Pl.'s Ex. J., Internal Affairs Summary Report Form.) The fact that at least twelve Cape May County sheriff's officers were disciplined the year of Franks' arrest suggests that the County's I.A. process has

complaints that were dismissed were improperly investigated and should have been sustained. Rather than simply reciting a number of complaints or offenses, a plaintiff must show "why those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action." Artiles v. Vitanza, No. 06-5427, 2009 WL 2426259, 2009 U.S. Dist. LEXIS 68820, at *29 (D.N.J. Aug. 6, 2009) (citing Mariani v. City of Pittsburgh, 624 F. Supp. 506, 511 (W.D. Pa. 1986)).

As with claims of inadequate training, a plaintiff alleging that her injuries were caused by inadequate investigation of civilian complaints must show something beyond mere negligence or even heightened negligence.  As the Third Circuit noted, "vague assertions about the police department's failure to investigate other wrongdoings" coupled with a single case of failure to investigate, standing alone, "will not support a reasonable jury finding of a municipal policy or custom of 'negligent supervision' which rises to the level of deliberate indifference required for Section 1983 liability." Groman, 47 F.3d at 637. See also, Russoli v. Salisbury Twp., 126 F. Supp.2d 821, 865 (E.D.Pa. 2000) ("One prior incident fails to fulfill the City of Canton requirement of repeated similar complaints or the Montgomery requirement of a pattern.").

Franks has not set forth sufficient evidence of similar incidents that have occurred in the past, save for the one in which she was involved, to satisfy the dictates of § 1983. Given the low incidence of complaints against officers Hegarty and Knoedler, and the existence of a formal civilian complaint process, the Cape May County Sheriff's Department did not have a policy of failing to investigate incidents of police misconduct.  Accordingly, summary judgment is granted as to this claim.

---

"teeth." See Beck, 89 F.3d at 974.

### D.   Strip-search Procedures

Franks also claims that Cape May County should be liable for the violation of her Fourth Amendment rights due to the unconstitutional strip search she was subjected to upon entry to the prison facility and because it inadequately trained its officers as to the constitutional limits of strip searches.[7]  Defendants counter that this claim cannot survive summary judgment because Franks has produced no evidence that the County's training program was inadequate.[8]

As parties dispute whether Franks was subjected to a "body cavity search" or a "visual observation," the Court will first define the nature of the search that Franks was subjected to before it sets out to determine whether the County is liable for application of an unconstitutional policy or on a failure to train theory.  New Jersey law defines a strip search as "the removal or rearrangement of clothing for the purposes of visual inspection of a person's undergarments, buttocks, anus, genitals or breasts." N.J. STAT. ANN. § 2A:161A-3(a). The same section defines a body cavity search as "the visual inspection <u>or</u> manual search of a person's anal or vaginal cavity." § 2A:161A-3(b)

---

[7]The term "strip search" generically refers to an array of searches and search techniques that vary in scope. See <u>N.G. v. Connecticut</u>, 382 F.3d 225, 228 n.4 (2d Cir. 2004) ("Strip search" is often used as an umbrella term that applies to all inspections of naked individuals.).

[8]In the alternative, Defendants ask this Court to move for a stay of the proceedings pending the Third Circuit's decision in <u>Florence v. Bd. of Chosen Freeholders and the County of Burlington</u>, 657 F.Supp.2d 504 (D.N.J. 2009).  Defendants argue that a ruling in <u>Florence</u> "would impact the constitutionality of the search conducted in the instant matter."  In <u>Florence</u>, this Court certified for interlocutory appeal the narrow question of whether a blanket policy of strip-searching *non-indictable* arrestees without reasonable suspicion upon entry into a county correctional facility violated the inmates' Fourth Amendment rights.  <u>See Florence</u>, 657 F.Supp.2d at 508; <u>infra</u> note 8.  Defendants argue that the facts in the instant matter are analogous to <u>Haas v. Burlington County, et al.,</u> No. 08-11102, 2009 WL 4250036 (D.N.J. 2009), in which defendants' motion to stay pending the Third Circuit's decision in <u>Florence</u> was granted.  However, the plaintiff in <u>Haas</u> was a non-indictable arrestee who opted out of the certified class in <u>Florence</u>.  Thus, while the outcome of <u>Florence</u> carries implications for the plaintiff's federal constitutional claims in that case, it does not for Franks's claims.  Accordingly, the motion to stay is denied.

(emphasis added). New Jersey state courts are split as to how intrusive a strip search must be to constitute a body cavity search under § 2A:161A-3(b). In State v. Anderson, No. 03-03-0221-I, 2007 WL 2752365, at *4 (N.J. Super. Ct. App. Div. Sept. 24, 2007), the court found that an officer that "merely spread defendant's buttock with one hand after defendant refused to do it himself" but did not search the defendant's anus did not perform a body cavity search. However, in State v. Hayes, the court found that a defendant who was ordered to bend over and "spread [his] cheeks" was subjected to a body cavity search. 743 A.2d 378, 384 (N.J. Super. Ct. App. Div. 2000). Decisions on this issue from the federal courts in this jurisdiction have been consistent with the court's ruling in Hayes, which characterized the visual inspection of a defendant's anal cavity as a body cavity search. See, e.g., Roberts v. Gillikin, No. 6-88, 2007 WL 2066383, at *2-3 (D.N.J. 2007) (defendant who was instructed to "bend over" for a visual inspection of his genitalia and anus was subjected to a body cavity search); Roderique v. Kovac, No. 85-5778, 2007 WL 17058, at *2-3 (D.N.J. Sept. 14, 1987) (holding that an officer who order defendant to bend over in order to perform a visual, but not manual, inspection of her anal and vaginal areas performed a body cavity search).  Here, Franks was instructed to "bend over," "spread your cheeks and cough," and "bend over so we can see." (King Report at 15). It appears that Franks was given instructions almost identical to those the officer gave to the defendant in Hayes. While techniques such as instructing a subject to squat and cough while naked do not fit neatly into one category or another, the instruction "bend over so we can see" indicates that the officers were attempting to visually inspect Franks's anal cavity. Accordingly, the Court will characterize the search performed on Franks as a body cavity search.

25

Next the Court considers whether there is a genuine issue of material fact as to the constitutionality of the County's strip search policy and training in regards to that policy.  Defendants contend that given that Franks was charged with resisting arrest and obstruction of justice, crimes of the third- and fourth-degree respectively, the correctional staff had lawful authority to subject Franks to a strip search upon admission to the county correctional facility pursuant to New Jersey Administrative Code § 10A: 31-8.5(a).[9] At the time of Franks arrest in 2007, the relevant portions of § 10A: 31-8.5 read:

> (a) The person authorized to conduct a strip search on a person lawfully confined in an adult county correctional facility shall obtain the permission of the supervisor on duty to conduct the search and shall file a written report explaining the reasons for the search.
> (b) Strip searches may be conducted in any of the following circumstances:
> > 1. Prior to admitting a person lawfully confined to an adult county correctional facility, prison or jail by court order or pursuant to an arrest authorized by law.

42 N.J. Reg. 34(a) (Jan. 4, 2010).[10] New Jersey Administrative Code § 10A: 31-8.7

---

[9]New Jersey law defines a crime as an offense for "which a sentence of imprisonment in excess of 6 months is authorized." N.J. STAT. ANN. § 2C:1-4(a) (West 2010). Such offenses are aptly dubbed "indictable" offenses. Franks was indicted for obstruction of justice, which is codified as a fourth-degree crime, see N.J. STAT. ANN. § 2C: 29-1(b), and resisting arrest, which is codified as a third-degree crime if the arrestee "uses or threatens to use physical force or violence against a law enforcement officer or another." N.J. STAT. ANN. § 2C: 29-2(a)(3)(a). Therefore, Franks was an arrestee that fell within the purview of New Jersey Administrative Code 10A:31-8.5.

[10]Section § 10A:31-8.5 has since been amended to comply with the guidelines promulgated by the New Jersey Attorney General's Office. That provision now reads:
(a) A person lawfully confined for commission of a crime shall be strip searched in any of the following circumstances:
1. The custody staff supervisor in charge authorizes confinement in an adult county correctional facility; and
2. The custody staff member authorized to conduct the strip search obtains the authorization of the custody staff supervisor in charge and one of the following exists:
i. A search warrant or valid documented consent; or
ii. A reasonable suspicion that an inmate is concealing a weapon, controlled dangerous substance, contraband or evidence of a crime.
N.J. Admin. Code § 10A:31-8.5(a) (West Supp. 2010).

prohibits jail officials from performing body cavity searches on inmates lawfully confined to county correctional facilities unless "the custody staff member in charge is satisfied that a reasonable suspicion exists that contraband will be found in the inmate's body cavity." N.J. ADMIN. CODE § 10A:31-8.7(a). The guidelines the New Jersey Attorney General disseminated to all county and local enforcement agencies governing the performance of strip searches generally afforded inmates more protection against unreasonable strip searches. Under those guidelines, both a visual observation and a body cavity search required that the officer in charge obtain either a search warrant, consent, or articulate reasonable suspicion that the incoming inmate was harboring contraband, a weapon or a controlled dangerous substance before the search could proceed. *See* ATTORNEY GENERAL'S STRIP SEARCH AND BODY CAVITY SEARCH REQUIREMENTS AND PROCEDURES FOR POLICE OFFICERS (revised 1995), § 2(B)(1)-(2), http://www.state.nj.us/lps/dcj/agguide/stripout.htm. The County asserts that its own internal procedures, outlined in a document titled "Inmate Searches, Clothed and Unclothed (No. 710)," generally complied with the abovementioned Administrative Code provisions and the New Jersey Attorney General's guidelines.[11]

While the court cannot overstate the intrusiveness of the search performed on Franks, her allegation that Cape May County failed to train its employees in proper body-cavity search procedures lacks evidentiary support. Plaintiff sets forth no

---

[11]The Cape May County Sheriff's Office's  internal procedure manual sets forth the same requirements for body cavity searches outlined in both the aforementioned Administrative Code provisions and the Attorney General's guidelines. Procedure 710.5, paragraph C of the manual, titled "Inmate Searches, Clothed and Unclothed (No. 710)" defines a body cavity search as a "visual inspection or manual inspection of a person's bodies [ sic] cavities," while procedure 710.4, paragraph A-3-B stipulates that the searching officer must have a "reasonable belief that the inmate is carrying contraband or other prohibited material" to proceed with a body cavity search. See Def.'s Ex. C, King Report at 16-17.

probative evidence that the officers who performed the search acted pursuant to a policy, custom or practice promulgated by the County. To the contrary, the County has an express written policy requiring that a body cavity search on a pretrial detainee be founded on reasonable suspicion that he or she was hiding contraband. Nor is there evidence that the Sheriff Callinan "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of or acquiesced in his subordinates' violations." A.M. ex. rel. J.M.K. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (internal citations omitted). In fact, Callinan explicitly admonished Hegarty and Knoedler's presence outside the door where Franks was searched as "unprofessional." (Callinan Dep. at 62:7-63:10.) The search performed on Franks likely deviated from the County's policy in that there was arguably no reasonable articulable suspicion that she was harboring contraband or weapons. Nonetheless, Franks was compelled to submit to an invasive body cavity search while officers Hegarty and Knoedler stood behind a thin curtain during the inspection. This clearly violated the section of the New Jersey Administrative Code § 10A:31-8.7, which requires a licensed medical professional conduct the body-cavity search at a location where the search "cannot be observed by unauthorized persons." N.J. Admin. Code § 10A:31-8.7(b)(1)(ii)–(iii) (West Supp. 2010). While this search deviated from established County and statewide procedures, a single incident does not establish a custom or practice for the purpose of a Monell claim. City of Oklahoma v. Tuttle, 471 U.S. 808, 823-24 (1985). Franks has not produced any probative evidence as to the nature and sufficiency of the training the County offers its officers on strip search procedures. While the Court recognizes that Franks was subjected to a degrading

body cavity search, to defeat Defendants' motion for summary judgment, she "may not rest upon a mere allegation or denials in [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Since a reasonable juror could not conclude that Cape May County had a policy of failing to train officers proper visual observation and body cavity search procedures, the Court grants the County's motion for summary judgment on the failure-to-train claim.

However, the Court's analysis does not end here. While Franks fails on a failure to train theory the Court next examines whether Cape May County's policy of strip searching all pretrial detainees by virtue of the offense that they are charged with is constitutional. Defendants argue that they were not required to articulate individualized suspicion to search Franks  because they were acting pursuant to a blanket policy permitting strip searches of all inmates upon admission to a county correctional facility.  What the Court gleans from the record, moving papers, and representations made at oral argument, is that Franks could be strip searched, because she was detained for an indictable offense.

In Bell v. Wolfish,441 U.S. 520, 561 (1949), the Supreme Court held that body cavity searches could be conducted on pretrial detainees on less than probable cause. The holding left open, however, precisely when such searches are constitutional. In determining whether a particular search is reasonable under the Fourth Amendment, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." Id. at 558.  In each case, a court must consider the scope of "the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." Id.

29

This Court has articulated that there must be a reasonable suspicion that an arrestee is concealing weapons or contraband on order for a strip search to be constitutionally justified. Davis v. City of Camden, 657 F. Supp. 396, 399 (D.N.J. 1987). This requisite suspicion can be supplied by either (1) "the specific circumstances relating to the arrest or arrestee," or (2) "the nature of the charged offense." Id. at 400. In Davis the court did not prohibit blanket strip search procedures; "it simply requires them to be predicated on some application of the reasonable suspicion standard." Florence v. Bd. of Chosen Freeholders of Burlington County, No. 05-3619, 2008 WL 800970, at *12 (D.N.J. 2008) (citing Davis, 657 F. Supp at 399, which stated that a blanket strip search policy would most likely be constitutionally acceptable if it applied only to individuals who were charged with felonies or with misdemeanors involving weapons or contraband) reh'g pending, 657 F. Supp. 2d 504 (D.N.J. 2009) (certifying questions for interlocutory appeal).

Defendants contend that Davis does not limit the authority of jail officials to conduct strip searches as invasive as the one performed on Franks when an arrestee is charged with any indictable crime whatsoever — even when particularized suspicion does not exist. However, the Davis court made clear that "a blanket risk approach, which permits jail administrators to infer reasonable suspicion on the basis of the charges alone, is an application of the reasonable suspicion standard, not a replacement for it." 657 F. Supp. at 400. The Davis court contemplated that a policy that required all pretrial detainees charged with felonies or drug-related weapons-related misdemeanor offenses would be constitutionally permissible because such policy contains an implicit recognition of reasonable suspicion, albeit a general one. See 657 F. Supp. at 400-01. As

Judge Cohen opined:

> As this court sees it, a blanket policy covering <u>only</u> persons charged with felonies or with misdemeanors involving weapons or contraband arguably is justifiable because it is based on a reasonable generalization: that persons charged with these offenses are likely to be concealing weapons or contraband.

<u>Id.</u> However, unlike in <u>Davis</u>, Cape May County's blanket strip search policy is not based on a reasonable generalization and is not sufficiently probative of the question of whether a particular arrestee is harboring contraband. A cursory examination of New Jersey statutes reveals a multitude of indictable offenses that similarly do not suggest possession of drugs or dangerous weapons. Examples of indictable offenses in this state include forgery, N.J. Stat. Ann. § 2c:21-1 et seq., willful tax evasion, N.J. Stat. Ann. § 54:52-10, and false impersonation, N.J. Stat. Ann. § 2c:21-17. It is unlikely that anyone arrested for these indictable offenses would be harboring weapons or contraband in their body cavities upon arrest without other incriminating circumstances giving rise to a reasonable suspicion. On the other hand, the County's policy would prohibit a strip search of persons charged with non-indictable offenses that would arguably be more likely to implicate drugs or weapons, i.e. being under the influence of a controlled substance in public, N.J. Stat. Ann. § 2c:35-10, or simple assault, N.J. Stat. Ann. § 2c:12-1.

This case provides a prime example of how Cape May County's sole reliance on the nature of the arrestee's offense fails to provide the requisite information that satisfies <u>Davis</u>. Franks was charged with obstruction of justice and resisting arrest, two indictable offenses that do not implicate necessarily drug or weapon offenses in any way. Officers Hegarty and Knoedler arrived at Franks's home with an arrest warrant for

Andrew Langford for unpaid child support, a non-violent offense. At the time of Hegarty's and Knoedler's arrival, Franks was babysitting her granddaughter. There is no indication that Hegarty or Knoedler found drugs in the subsequent search of Franks's home.  Franks did not have a history of violence or a weapon at the time of her arrest. Even if the Court accepts Defendants' contention at oral argument that Franks was hostile and combative during her arrest, it strains credulity to suggest that either the arresting or searching officers had an articulable suspicion that Franks was secreting contraband into the correctional facility by virtue of these charges alone.

Franks, the non-moving party, has presented enough evidence, when viewed in the light most favorable to her, to create a genuine issue of material fact regarding whether Cape May County maintained a policy of strip searching all pretrial detainees on the basis of the nature of the charges alleged against them. Undersheriff Reemer testified that he understood the policy at the correctional center to authorize a search of all arrestees, when in fact the internal procedure manual only authorized such searches when there is reasonable suspicion that the arrestee is concealing a weapon, a controlled dangerous substance or contraband. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 15, citing Pl.'s Ex. F at 122:9-23; Ex. G).

There is a genuine issue of material fact as to whether the County maintains a custom or practice of strip searching all arrestees charged with indictable offenses upon admission to the county correctional facility by virtue of the nature of their charge alone. Arguably such a custom or practice would not pass constitutional muster, even under the broad guidelines set forth by Bell. Therefore, Defendants' motion for summary judgment is denied as to the constitutionality of County's strip search policy.

32

**IV.    CONCLUSION**

For the reasons expressed above, Defendants' motion for summary judgment

will be granted in part and denied in part. An appropriate order will issue on even date.


Dated: September 8, 2010                    /s/ Joseph H. Rodriguez_____
                                        Joseph H. Rodriguez
                                        United States District Judge